**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Kerry Kim Voegele, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING PLAINTIFF'S** |
| | ) | **MOTION FOR SUMMARY JUDGMENT,** |
| | ) | **GRANTING COMMISSIONER'S** |
| vs. | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | **AND AFFIRMING COMMISSIONER'S** |
| Commissioner of the Social Security | ) | **DECISION** |
| | ) | |
| | ) | Case No. 1:20-cv-217 |
| Defendant. | ) | |

Plaintiff Kerry Kim Voegele ("Voegele") seeks judicial review of the Social Security Commissioner's denial of his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. This court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). For the reasons that follow, the Commissioner's decision is affirmed.

I.   **BACKGROUND**

A.   **Personal History**

Voegele was 56 years old on the alleged onset date of disability and 58 years old at the time of his administrative hearing. Doc. No. 18-2 at p. 32; Doc. No. 18-5 at p. 22. He has completed one year of college. Doc. No. 18-2 at p. 33. He lives in rural North Dakota with his ex-wife/girlfriend. Id. at p. 38. He has a valid driver's license. Id. at p. 34. Over the relevant period he worked as a driller helper, floor hand, roustabout, seismograph laborer, and survey helper. Doc. No. 18-2 at p. 43; Doc. No. 18-3 at p. 13; and Doc. No. 18-6 at pp. 2, 18, 19, 40, and 51.

Voegele sustained a traumatic brain injury, hip fractures, a jaw fracture, and a broken wrist/thumb in a 1986 motorcycle accident. Doc. No. 18-2 at p. 37; Doc. No. 18-5 at p. 22; Doc. No. 18-7 at p. 40. He lost vision in his left eye, some range of motion in his right wrist, and the

1

ability to fully oppose his right thumb.  Doc. No. 18-2 at p. 34; Doc. No. 18-7 at p. 40.  He also developed neurocognitive and adjustment disorders.  Doc. No. 18-2 at pp. 34-35.

In May 2009, the ring and pointer fingers on Voegele's left hand were amputated at or slightly below the second knuckle in a work-related accident.  Doc. No. 18-2 at p. 35; Doc. No. 18-5 at p. 17.  Voegele's arm was also injured in the accident.  Doc. No. 18-6 at p. 39.

### B.    Relevant Medical Records

#### 1.    Dr. Ed Kehrwald

Ed Kehrwald, PhD/LAC, conducted a psychological consultative examination of Voegele on September 12, 2009.  Doc. No. 18-7 at p. 5-8.  His impressions were as follows.  In addition to Voegele's physical problems, there was evidence of visual memory difficulty and suggestion of possible disinhibition and personality change after his head injury.  Id. at p. 8.  Voegele's sequencing ability appeared to remain intact but there was evidence of some decay in memory after a delay.  Id.  Voegele appeared to have the skills to manage, perhaps with some assistance, any benefits he may receive.  Id.  Voegele also appeared to have the cognitive skills to manage a variety of work-related tasks involving repetitive work and limited public contact.  Id.  However, Voegele's reduced tolerance for frustration and reduced persistence created additional complications with respect to managing work stress. Id.

Based upon the information available to him, Dr. Kehrwald made the following diagnosis:

| | |
|---|---|
| Axis I: | Adjustment Disorder with Anxietty<br>Cognitive and Personality changes due to heady injury |
| Axis II: | Mixed Personality Traits |
| Axis III: | Left eye, hand, should[er] problems, neck problems, past CHIA<br>GAF = 58<br>R/O Alcohol Abuse by hx |

2

(Id.).

### 2.    Dr. D.J. Erikson

Voegele treated with D.J. Erikson, D.C., from February 24, 2016, until February 8, 2017, at Erikson chiropractic. Id. at pp. 66-67. Progress notes reflect positive cervical compression on both sides, mild to moderate decrease in cervical range of motion ("ROM"), segmental dysfunction and palpable tenderness, and a mild to moderate decrease in lumbar ROM with flexion and extension. Id. at p. 66. They further reflect that Voegele had a positive straight leg raise test; left leg flexion was to 60 degrees associated with pain in his left low back, mild left-sided lower back pain with Patrick Faber test, and a positive scope reading with segmental restriction over the sacrum. Id. at p. 67.

### 3.    Coal Country Community Health Center

Voegele treated at Coal Country Community Health Center from February 7, 2017, until January 1, 2019. Id. at pp. 21-28, 47-56, 71-87.

#### a.    Dr. Aaron Garman

Voegele presented to Dr. Aaron Garman on February 7, 2017, with complaints of pain in his chest and mid back. Id. at p. 25. According to Dr. Garman's notes, Voegele had been experiencing chest and back pain since shoveling snow at work five days earlier. Id. Voegele's physical examination was unremarkable; his vital signs were good, his chest x-ray was negative, an EKG showed sinus bradycardia but no ST elevation or depression and looked pretty good, his Troponin was normal, his Thyroid was normal, and his CBC and Chem-8 were unremarkable. Id. Attributing Voegele's pain to strained muscles as opposed to any cardiac-related event, Dr. Garman instructed Voegele to continue with chiropractic and massage, anti-inflammatories, stretching, and heat. Id.

Voegele returned to Dr. Garman on March 13, 2018, for a general checkup.  Id. at p. 21. According to Dr. Garman's notes of this visit, Voegele had ongoing problems with back pain, bilateral arm pain, and jaw pain, loss of vision in his left eye, and decreased vision in his right eye. Id.  Physical finding were unremarkable.  Id. at p. 23-24.  Dr. Garman suggested labs, medication, a visit with an eye doctor, and a CT scan of Voegele's chest, to which Voegele responded that he could not afford it.  Id.

Voegele next presented to Dr. Garman on April 6, 2018, with left knee pain.  Id. at p. 54. According to Dr. Garman's notes, Voegele was shoveling snow on uneven ground the week prior, felt a twist and a pop in his knee, and had been experiencing pain.  Id.  Dr. Garman suspected that Voegele may have torn his meniscus.  Id.  After some discussion, the decision was made to hold off on a surgical consult and instead continue with a combination of rest, ice, and ibuprofen and see how things developed.  Id.

Voegele returned to Dr. Garman on April 20, 2018, with a "Medical Source Statement (Physical)" for Dr. Garman to fill out.  Id. at p. 53.  In his notes, Dr. Garman stated that Voegele's knees, hips, and left shoulder were bad, and that Voegele struggled doing day-to-day activities on account of his pain and immobility.  Id.

Dr. Garman completed a "Medical Source Statement (Physical)" on April 20, 2018.  Id. at p. 34. Answering pre-printed questions by checking the appropriate box, he indicated that Voegele: would miss 4 days of work per month due his medication conditions; could sit infrequently, stand, stoop, and climb; could occasionally walk, could frequently lift up to ten pounds, could occasionally lift eleven to twenty pounds, and infrequently lift twenty pounds of more. Id.  He further indicated that Voegele could never raise his left arm over his shoulder or use his hands for fine manipulation, could only occasionally use his hands for gross manipulation, but could frequently raise his right

4

arm over his shoulder.  Id.    With respect to Voegele's pain, he stated that it was severe and estimated that Voegele would spend thirty percent of an eight-hour workday off task because of it and would need to lie down approximately one to two hours.  Id. at p. 35.

On July 31, 2018, Voegele reported to Dr. Garman with complaints of heel pain.  Id. at p. 80.  Concluding that he likely had Achilles tendonitis, Dr. Garman immobilized him in a boot and referred him to a physical therapist, Eric Klindworth, MPT, for further evaluation and treatment of his right ankle and Achilles.  Id.

Voegele next presented to Dr. Garman on January 1, 2019, with complaints of left knee pain that, on a scale of one to ten, he rated a four.  Id. at p. 71.  According to Dr. Garman's notes, Voegele was kicked by calf about a month prior to his visit and was continuing to experience pain, especially when bending his knee. Id. X-rays were negative.  Id. at pp. 71, 87.  His MCL and LCL appeared to be intact. Id. Attributing the pain to muscle strain or tenderness because of a contusion, Dr. Garman advised him to rest, ice, use ibuprofen, and follow up as necessary.  Id.  at p. 71.  Dr. Garman also offered him physical therapy but he refused.  Id.

### b.    PA Burton Mollman

Voegele presented to Burton Mollman, PA, on February 7, 2017, with complaints of pain in his chest and mid back.  Doc. No. 18-7 at pp. 25-26.  According PA Mollman's notes, Voegele had been experiencing chest and back pain since shoveling snow five work days prior.  Id. at p. 26. Voegele's vitals were normal, his chest x-ray was negative, his physical exam was unremarkable, EKG showed sinus bradycardia but no ST elevation or depression and looked pretty good.  Id. Attributing Voegele's pain to muscle strain as opposed to a cardiac event, PA Mollman instructed Voegele to continue with chiropractic and massage, anti-inflammatories, stretching, and heat.  Id.

5

### 4.    Physical Therapist Eric Klindworth

As noted above, Dr. Garman referred Voegele to PT Klindworth for therapy on his right ankle and heel.  Id. at p. 80.

Voegele first reported to PT Klindworth on August 6, 2018.  Id. at p. 79. According to PT Klindworth notes of this first session, Voegele presented with what appeared to be a healed partial Achilles tear.  Id.  PT Klindsworth performed some manual therapy, guided Voegele through some therapeutic exercises, and instructed Voegele to wear his walking boot at all times when leaving home, use ice for swelling and pain control, and to continue with his exercises.  Id.

Voegele returned to PT Klindworth five more times in August 2018 for therapy.  Id. at p. 75-78.  In his notes of sessions held August 9, 14, 17, and 21, 2018, PT Klindworth documented Voegele's steady progress.  In notes of a session held on August 24, 2018, PT Klindworth observed that, two days prior, Voegele had reportedly walked two to three miles without his boot while rounding up some calves, was periodically wearing the walking boot while outside, and had generally discontinued using the walking boot while at home.  Id.  Noting Voegele's apparant improvement, PT Klindworth left it to Voegele's discretion as to when and where to wear the walking boot.  Id.

Voegele had two more sessions with PT Klindworth in September 2018.  Id. at p. 73.  In his notes of a session held on September 4, 2018, PT Klindworth observed that Voegele was not wearing the walking boot much at all, did not have a lot of ankle pain, and had continued to improve.  Id.  In his notes for a session held on September 9, 2018, PT Klindworth observed Voegele still had a bit of soreness with over activity when came to weight bearing and ambulation but had pretty much returned back to normal, no longer required regular therapy, and need only return as

6

needed.  Id. at p. 72.

### 5.    Dr. Jacinta Klindworth

Voegele reported to Jacinta Klindworth, M.D, on May 29, 2018, for physical consultative examination.  Doc. No. 18-2 at pp. 39-45, 49-51.  On a "Brief Mental Status Exam (MSE) Form," Klindworth indicated that Voegele's affect was reactive, mood congruent, and in the normal range. Id. at p. 39.  She further indicated that Voegele was oriented and that he sometimes had trouble remembering things but that his short term and long term memory were intact and that his insight and judgment were good.  Id.

In her treatment notes, Dr. Klindworth initially noted that Voegele's history included: near complete vision loss in his left eye that affected his depth perception; the loss of parts of the index and middle fingers on his left hand;  pain, weakness, and decreased grip strength in his right hand; decreased ROM in his right wrist; and bilateral hip pain that came and went.  Id. at pp. 40, 49.  She then went on to note that Voegele was able to focus during their conversation, had a normal to slightly decreased attention span, but had some trouble sitting still due in part to his hip pain.  Id.

With respect to Voegele's fingers, Dr. Klindworth observed the amputations on Voegele's left hand, a right thumb deformity that left him unable to fully grip,  Herberden's nodes on his right hand,  and questionable synovitis in the second and third MPCs (joints) on his right hand.  Id. at pp. 42, 51.  With respect to Voegele's hands, she observed  there was moderately decreased extension and mildly decreased flexion in his right wrist, normal supination and pronation, the ability to pick up a pen without difficulty with the right hand, and the ability with some effort to grasp between his thumb and remaining portions of his index and middle fingers on his left hand.  Id.

With respect to Voegele's hips, the radiology reports of x-rays ordered by Dr. Klindworth

stated there were mild arthritic changes in the left and very mild arthritic changes in the right.  Id. at pp. 44-45, 55-56.

Voegele returned to Dr. Klindworth on June 11, 2018, for a reevaluation of his fingers and an evaluation of swelling of his left neck.  Id. at p. 49.  Dr. Klindworth ordered some lab work, prescribed him with Rocephrin and Cefdinir, and instructed him to return at the end of the week for a reevaluation of his neck.  Id.

Voegele returned to Dr. Klindworth on June 15, 2018, for further evaluation of his neck.  Id. at p. 47, 82.  Noting that his labs actually looked pretty good, she continued him on medications she has previously prescribed– Rocephin and Cefdiniar–with instructions to return the following week. Id.

### 6     Dr. Orlon Jackson

Voegele reported to Orlon Jackson, D.O., on August 20, 2019, for a physical consultive examination.  Id. at pp. 91-93.  Dr. Jackson noted the following in his report.  Voegele was injured in a 1986 motorcycle accident and a 2017 workplace accident.  Id. at p. 99. Voegele related that he has difficulty performing certain maneuvers, such as using his nondominant left hand for fine motor skills.  Id.  Voegele described problems judging distance due to his monocular vision and thus did not feel comfortable driving in the snow, driving large vehicles, or performing activities that require binocular vision.  Id. at pp. 99-100.  Voegele complained of bilateral pain.  Id. at p. 100.  While Voegele was able to perform unlimited walking, stooping and standing, he reported having difficulty with activities such as prolonged sitting and needed to shift positions frequently.  Id.  Voegele had been bothered by some anxiety as well as frustration with his abilities, and had some anger issues. Id. at pp. 100-101.

Dr. Jackson made the following observations following his examination.  Voegele had a deformity of the IP joint of the right thumb, amputations of the  index and long fingers on his left hand, a mildly decreased range of motion in the right wrist.  Id. at pp. 101-102.  He had normal reflexes, no difficulty  maneuvering around the exam room, adequate balance, the ability to walk on his heels and toes without difficult, and the ability to assume a full squat and arise from a squatting position using his left hand for support and balance.  Id.  His shoulder range of motion was normal.  Id. at p. 102.  His left wrist was "sympomatic," with decreased  flexion and extension.  Id.  His grip strength was mildly asymmetric–normal on his right side and mildly decreased on his left--due to the amputations of fingers on his left hand.  Id.  He was able to pick up a small scrap of paper easily  with his right hand and will a difficulty with his left.  Id. He had no difficulty ambulating and used no assistance devices other than a walking stick that his girlfriend had given him and that he used when performing long hikes.  Id. at. pp. 101-102.

In a "Medical Statement of Ability to do Work-Related Activities (Physical)," Dr. Jackson indicated that Voegele could lift and carry up to ten pounds frequently, eleven to fifty pounds frequently, and  fifty-one to one-hundred pounds occasionally. Id. at p. 91.  Next, he indicated that Voegele could sit for thirty minutes, stand for two hours, and walk for eight-hours without interruption.  Id. at p. 92.  He also indicated that, in a typical work day, Voegele could sit and/or stand for eight hours with frequent changes of position and walk for a total of eight hours without difficulty. Id.

With respect to any particular medical or clinical findings, Dr. Jackson noted that x-rays had shown mild osteoarthritic changes.  Id.

With respect to Voegele's ability to use his hands, Dr. Jackson opined that Voegele could

continually handle, finger, feel and push/pull with right.  Id. at p. 93.  Dr. Jackson further opined that, with his left hand, Voegele could continuously reach provided that it was not overhead, occasionally reach overhead, handle, finger, and feel, and could frequently push/pull.  Id.

With respect to Voegele's performance of postural activities, Dr. Jackson opined that Voegele could climb, balance, stoop, knee, crouch, and crawl.  Id. at p. 94.

With respect to Voegele' vision, Dr. Jackson opined, that, in spite of the blindness in his left eye, Voegele retained the ability to read very small print, read ordinary newsprint or bookprint, differentiate the shape and color of small objects, and avoid ordinary workplace hazzards, such as boxes on the floor, open doors, or approaching people or vehicles.  Id.

With respect environmental limitations, Dr. Jackson opined that Voegele could continuously tolerate all environmental conditions save unprotected heights, which he could tolerate frequently. Id. at p. 95.  He added that Voegele would have difficulty driving in inclement weather on account of his monocular vision.  Id. at p. 96.

### C.    Procedural History

#### 1.    Application for DIB

Voegele filed an application for DIB on March 19, 2018, alleging a disability onset date of February 15, 2018.  Doc. No. 18-5 at pp. 2-5.  His application was denied initially on June 28, 2018, and upon reconsideration on August 21, 2018.  Doc. No. 18-4 at pp. 6-8, 11-13.

#### 2.    Administrative Hearing

On August 29, 2018, Voegele requested a hearing before an Administrative Law Judge ("ALJ").  Doc. No. 18-4 at pp. 14-15.  The Social Security Administration ("SSA") acknowledged the request in a letter dated September 24, 2018.  Id. at p. 16.

On September 13, 2019, the ALJ convened an administrative hearing.  Doc. No. 18-2 at pp. 28-47.  Voegele appeared with counsel.  A Vocational Expert was also present.

### a.    Voegele's testimony

Voegele testified that, while he remains capable of driving, he does not always feel comfortable doing so on account of the vision loss in his left eye and the resulting lack of depth perception.  Doc. No. 18-2 at p. 31-34.  He further testified that, since suffering his traumatic brain injury, he is easily frustrated, disinhibited, leaving him more prone to say things that others may not, and sometimes has problems getting along with people.  Id. at pp. 34-45, 41.  When asked to elaborate about his vision issues, he testified that he cannot see well in low light, that he constantly trips or runs into things, the corner of a chair being an example, due to his lack of depth perception. Id. at pp. 41-42.

With respect to this hands, Voegele testified that he continues to use both but that he drops things all the time with his left and that the arthritis in his right has been steadily getting worse.  Id. at pp. 35-36.  He added that he lost some ROM in his wrist in the wake of his motorcycle accident that has affected his hand strength.  Id. at pp. 37.  When asked how much he remained capable of lifting, he responded that he could lift twenty pounds so long as he did not have to carry it far.  Id.

With respect to his hips, Voegele testified that he is in constant pain, that he has to "loosen them up" before walking, and that his level of discomfort can fluctuate depending upon the weather. Id. at pp. 37-38.  When asked whether he has received treatment for his hips, he responded that he has been to chiropractors but that there is little that they can do for him.  Id. at p. 38.  When asked whether he takes medication for pain, he responded that he takes aspirin and/or ibuprofen. Id.

With respect to his responsibilities around his home, Voegele testified that he does some chores, such as washing dishes or tending to the garden, but that his girlfriend mows the lawn.  Id.

at p. 39.  He further testified that he keeps an eye on his brother's cattle and that in the course of doing so he had recently fixed fence, knowing that he would feel it later.  Id.  When asked how he spends his free time, he responded that he watches a lot of television, tries to walk around as much as he can for exercise, and may go on the occasional road hunt but seldom fishes anymore.  Id. at p. 40.

**b.    VE's testimony**

The ALJ asked the VE whether a hypothetical person of Voegele's age and with the same education and work history as Voegele could perform Voegele's past work if he: (a) could lift and/or carry 50 pounds occasionally and 25 pounds frequently; (b) could frequently climb ramps and stairs but only frequently climb ladders, ropes, or scaffolds; (c) could occasionally balance and frequently stoop, kneel, crouch, and crawl; (d) limited finger bilaterally to an occasional basis; (e) could only have occasional exposure to hazardous machinery and unprotected heights; (f) required work environment with no more than moderate noise levels; and (g) could not perform tasks that require more than occasional use of depth perception.  Id. at p. 44.  The VE responded in the negative.  Id..  When asked by the ALJ whether there would be other jobs in the national economy this person could perform, the VE responded in the affirmative and cited kitchen helper and sweeper/cleaner as examples of such jobs.  Id. at pp. 44-45.  When asked by the ALJ whether Voegele would have any transferrable skills to a range of light or sedentary work, the VE responded in the negative.  Id. at p. 45.

When asked by counsel to consider whether a hypothetical person described by the ALJ could perform the jobs of kitchen helper or sweeper/cleaner if unable to avoid normal hazards at a work location, the VE responded that such an inability would eliminate all jobs.  Id.

12

### 3.     ALJ's Decision

On October 10, 2019, the ALJ issued a written decision.  Id. at pp. 11-21.  Employing the

five-step sequential evaluation mandated by 20 C.F.R. § 404.1520, he concluded that Voegele was

"not disabled under sections 216(i) and 223 of the Social Security Act."  Id. at p. 21.

Specifically, at steps one and two, the ALJ  recognized that Voegele met the insured status

requirements of the Social Security Act, had not engaged in substantial gainful activity since the

alleged onset date of his disability.  Id. at p. 13.

At steps two and three, the ALJ determined that Voegele suffered from the following severe

determinable impairments that limited his ability to perform basic work activities: "vision loss, left

eye; osteoarthritis, right hand; left hand finger amputations; and dengerative joint disease, bilateral

hips."  Id. at p. 13-14.  He further determined that Voegele's medically determinable  impairments

did not alone or in combination meet or medically equal any of the presumptively disabling

impairments listed at 20 C.F.R. § 404, Subpart P, Appendix 1.  Id. at p. 14.

Notably, the ALJ found Voegele's neurocognitive and adjustment disorders to be nonsevere

as they caused no more than "mild" limitations in any of the four functional areas set out in the

disability regulations for evaluating mental disorders and the listing of impairments at 20 C.F.R. §

404, Subpart P, Appendix 1.  Id.   What follows is the ALJ's articulated basis for this finding:

> The first functional area is understanding, remembering, or applying information. In
> this area, the claimant has a mild limitation. Treatment providers have not
> documented problems with the claimant's memory during the relevant period (6F/6;
> 7F/5). He is able to manage his personal care needs, prepare meals, do dishes, do
> laundry, mow the yard, garden, shop, drive short distances, care for a dog, help
> watch cattle and mend barbed wire fencing (6E; hearing testimony). All of these
> activities require an ability to understand, remember and apply information, such as
> sequencing steps or using tools. He has a mild limitation.
>
> The next functional area is interacting with others. In this area, the claimant has a
> mild limitation. The claimant lives with his girlfriend with no documented difficulty

getting along with her (hearing testimony). Although he alleges problems getting along with others since his traumatic brain injury due to frustration, and feelings of inferiority, he is able to interact with his brothers that live close by, regularly visit family and friends, and attend church (6E/5, 6; hearing testimony). The claimant is also able to shop with no documented difficulty getting along with store clerks or other shoppers (6E/4; hearing testimony). Additionally, he is able to interact appropriately with treatment providers. The claimant has a mild limitation.

The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has a mild limitation. The claimant alleges problems with concentration (hearing testimony). However, he is able to prepare meals, do dishes, do laundry, mow the yard, garden, shop, drive short distances, help watch cattle, and mend barbed wire fencing (6E; hearing testimony). The claimant also testified that he is able to watch television programs like the news and football games. Although he testified that he may require breaks when watching long programs, it was due to physical pain and not psychologically based symptoms. All of these activities require some ability to concentrate, persist and maintain pace. He has a mild limitation.

The fourth functional area is adapting or managing oneself In this area, the claimant has a mild limitation. The claimant is able to manage his own personal care needs, and his treatment providers do not express any concerns related to his hygiene (6E/2). He also interacts appropriately with treatment providers, and does not have regular emotional outbursts. Despite his diagnoses of neurocognitive disorder due to traumatic brain injury and adjustment disorder, the claimant also worked for several years (IF/7; IE; 2E; 3E/3; SE). His work history and reported activities show that the claimant is able to adapt to some degree of change, respond to demands, set realistic goals, make independent plans, and is aware of normal hazards. He has a mild limitation.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas, they are nonsevere (20 CFR 404.1520a(d)(l)).

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

Id. at pp. 13-15.

At step four, the ALJ determined that Voegele retained the residual function capacity to perform medium work with the following limitations:

> The claimant is able to lift and/or carry 50 pounds occasionally and 25 pounds frequently. He can stand and/or walk about 6 hours in an 8-hour workday and can sit for about 6 hours. He can frequently climb ramps and stairs but only occasionally climb ladders, ropes, and scaffolds. He can occasionally balance and frequently stoop, kneel, crouch, and crawl. He would be limited to fingering occasionally bilaterally. He can have only occasional exposure to extreme cold, hazardous machinery, and unprotected heights. He would need to work at a job with no more than moderate noise levels (as defined by the Selected Characteristics of Occupations) and with a need for no more than occasional need for depth perception.

Id. at p. 16.

In making this determination the ALJ acknowledged that Voegele's medically determinable impairments could reasonably be expected to cause some of his alleged symptom. Id. However, he discounted Voegele's subjective complaints regarding the intensity, persistence, and limiting effects of his symptoms on the grounds that they were not entirely consistent with the medical evidence and other evidence in the record. Id.

The ALJ declined to defer or otherwise afford controlling weight to any prior administrative medical findings or medical opinions regarding Voegele's conditions. Id. p. 18. That being said, the ALJ found the assessments of the State agency consultants to be persuasive as they were consistent with and supported by the objective evidence, Voegele's testimony, and the activities of Voegele's daily living. Id. He likewise found Dr. Kehrwald's opinion persuasive given that it was consistent and supported by Voegele's work history. Id. at p. 19. However, he hastened to add that Dr. Kehrwald's opinion would only be considered to the extent that it established any longstanding psychologically based impairments or symptoms for Voegele as it provided little insight into Voegele's limitations during the period at issue.

The ALJ found Dr. Garman's opinion unpersuasive. Id. at pp. 18-19. In so finding, he noted

the dearth of physical findings in Dr. Garman's notes and that the fact that Dr. Garman has provided little if any explanation for his conclusions.  Id. at p. 19.

 The ALJ next considered whether Voegele was able to perform her past relevant work.  Id. at 19-20.  Based on the VE's testimony at the administrative hearing, the ALJ concluded that Voegele could not perform this work.  Id.

At the fifth and final step of his analysis, the ALJ concluded that Voegele was not disabled as he could make a successful adjustment to other work existing in significant numbers in the national economy that he was capable of performing given his age,  work experience, and RFC.  Id. at pp. 20-21.

### 4.    Appeals Council's Decision

Voegele timely requested a review of the ALJ's decision by the Appeals Council.  On September 22, 2020, the Appeals Council denied Voegele's request, rendering the ALJ's decision the final decision of the Commissioner.  Doc. No. 18-2 at pp. 2-4.

### 5.    Request for Judicial Review

Voegele initiated the above-captioned action by Complaint on November 24, 2020.  Doc. No. 1.  On July 28, 2021, he  filed a Motion for Summary Judgment.  He asserts that the ALJ failed to property evaluate and credit the opinion of his treating physician, incorporate his mental limitations in the RFC, and properly evaluate his subjective complaints.  He further asserts that the ALJ"S step five determination is unsupported.   He requests that the ALJs decision be vacated and that this matter be remanded for further administrative proceedings.  Doc. No. 20.

On August 27, 2021, the Commissioner filed a combined Motion for Summary Judgment and response to Voegele's motion.  Doc. Nos. 21 and 23.  On September 3, 2021, Voegele filed a

reply to the Commissioner's response to his motion.  Doc. No. 24.

## II.    APPLICABLE LAW

### A.    Standard of Review

The scope of this court's review is limited in that it is not permitted to conduct a *de novo* review.  Rather, the court looks at the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence. Ellis v. Barnhart, 392 F.3d 988,  993 (8th Cir. 2005).

Substantial evidence is less than a preponderance, but more than a scintilla of evidence. Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   It  is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nelson v. Sullivan, 966 F.2d at 366 n.6 (quoting Richardson v. Perales, 402 U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results.  Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the standard  "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." Id.   Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence - even when the court would weigh the evidence differently and reach an opposite conclusion.  Id.

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole.  See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999); Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993).  The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." Anderson v.

17

Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner. The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner. Ellis v. Barnhart, 392 F.3d at 993.

### B.    Law Governing Eligibility for Adult Benefits

"To be eligible for disability insurance benefits, a claimant has the burden of establishing the existence of a disability under the Social Security Act ("Act"). 42 U.S.C. § 423(a)(1)(D). To meet this burden, the claimant must show: (1) a medically determinable physical or mental impairment that has lasted, or can be expected to last, for not less than twelve months; (2) an inability to engage in any substantial gainful activity; and (3) that this inability results from the impairment. 42 U.S.C. § 423(d)(1)(A)." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

"Substantial gainful activity" under the Act includes any substantial gainful work that exists in the national economy, regardless of (1) whether such work exists in the immediate area in which the claimant lives, (2) whether a specific job vacancy exists for the claimant, or (3) whether the claimant would be hired if he or she applied for work. 42 U.S.C. § 423(d)(2)(A). Work available in the national economy with respect to a particular person means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id.

In deciding whether a claimant is disabled within the meaning of the Act, the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520 and determine:

(1)    whether the claimant is presently engaged in a substantial gainful activity,

(2)    whether the claimant has a severe impairment that significantly limits the

claimant's physical or mental ability to perform basic work activities,

(3)     whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4)     whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5)     if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches the fourth step, the ALJ must determine a claimant's RFC, which is what the claimant can do despite his or her limitations. 20 C.F.R. § 404.1545. The ALJ is required to make the RFC determination based on all relevant evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations. Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions." Id. In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).[1] E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005). Claimant's

_____

[1] In Polaski, the Eighth Circuit approved a settlement agreement with the Secretary of HHS that contained, in part, the following language, which the court stated was a correct statement of the law with respect to the manner in which subjective pain complaints are to be analyzed:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties

subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole.  Pearsall v. Massanari, 274 F.3d at 1218.

Also, the ALJ must give controlling weight to medical opinions of treating physicians that are supported by accepted diagnostic techniques and that are not inconsistent with other substantial evidence.  This rule does not apply, however, to opinions regarding disability or inability to work because these determinations are within the exclusive province of the Commissioner.  The Eighth Circuit has summarized the relevant rules regarding treating physician opinions as follows:

> Generally, an ALJ is obliged to give controlling weight to a treating physician's medical opinions that are supported by the record. See Randolph v. Barnhart, 386 F.3d 835, 839 (8th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). A medical source opinion that an applicant is "disabled" or "unable to work," however, involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight. See Stormo [v. Barnhart], 377 F.3d [801, 806 (8th Cir. 2004)] ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal marks omitted)); 20 C.F.R. § 404.1527(e)(1). Further, although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner. See 20 C.F.R. § 404.1527(e)(2).
>  . . . .
> The Commissioner defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. § 404.1527(a)(2). "A treating physician's opinion is due 'controlling weight' if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir.

---

and treating and examining physicians relating to such matters as:
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication; and
> 5. functional restrictions.

The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. [Emphasis in original.].

739 F.2d at 1322.  The Polaski factors are now embodied in 20 C.F.R. § 404.1529.

2001) (quoting <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1012-13 ([8th Cir.] 2000)).

<u>Ellis v. Barnhart</u>, 392 F.3d at 994-995.

Disability determinations made by others, while relevant evidence, are not controlling upon the Commissioner.  The Commissioner is charged with making her own disability determination based upon the criteria set forth in the Social Security law.  20 C.F.R. § 404.1504. <u>E.g., Jenkins v. Chater</u>, 76 F.3d 231, 233 (8th Cir. 1996).  And, if the ALJ proceeds to the fifth step, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  <u>Pearsall v. Massanari</u>, 274 F.3d at 1217.

## III.    DISCUSSION

### A.    Consideration of Dr. Garman's Opinion

For claims like Voegele's that were filed on or after March 27, 2017, the weight assigned to medical opinions is governed by 20 C.F.R. § 404.1520c.  <u>Pemberton v. Saul</u>, 953 F.3d 514, 517 n.2 (8th Cir. 2020).  Under this regulation, the ALJ does not defer to any medical opinions, including opinions from the claimant's treating medical sources. 20 C.F.R. § 404.1520c(a).  Rather, the ALJ considers all medical opinions according to five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors.  20 C.F.R. § 404.1520c(c).  Supportability and consistency are the most important factors, and the ALJ must explain how those two factors were considered in determining the persuasiveness of a medical opinion. 20 C.F.R. § 404.1520c(b)(2). The ALJ is not required to explain the remaining factors unless the ALJ "find[s] that two or more medical opinions ... about the same issue are both equally well supported ... and consistent with the record ... but are not exactly the same." 20 C.F.R. § 404.1520c(b)(2)-(3).

The new regulations no longer specifically state that an ALJ must give "good reasons" for the weight given to medical opinions.  <u>Compare</u> 20 C.F.R. § 404.1527 (old rule) <u>to</u> 20 C.F.R. §

404.1520c; see also Thomas v. Kijakazi, No. 4:20 CV 363 DDN, 2021 WL 3566621, at *6 (E.D. Mo. Aug. 12, 2021) ("The new regulation ... relaxed the requirement that ALJs provide 'good reasons' for the weight given to medical opinions."). However, an ALJ's explanation for the weight given to a medical opinion must still be "adequately articulated" and "supported by substantial evidence." Thomas, 2021 WL 3566621, at *7–8; Dornbach v. Saul, No. 4:20-CV-36 RLW, 2021 WL 1123573, at *11 (E.D. Mo. Mar. 24, 2021) (reversing and remanding the Commissioner's decision because the "ALJ did not adequately support his reasoning for rejecting the treating medical sources' opinions" under 20 C.F.R. § 404.1520c); Smith v. Kijakazi, No. 3:20-CV-00364 (PSH), 2022 WL 193063, at *3 (E.D. Ark. Jan. 20, 2022) ("ALJs are required to 'explain' their decisions as to the two most important factors—supportability and consistency.").

Voegele maintains that the aforementioned regulations do not support the ALJ's rejection of Dr. Garman's opinion. Specifically, Voegele asserts that Dr. Garman's opinion was informed by his familiarity with Voegele's impairments (he had been Voegele's primary care physician since at least 2009) and consistent with his own notes as well as the progress notes of Erikson chiropractic, the observations of PA Mollman, and the observations of both Dr. Jackson and Klindworth regarding his vision, hips, hands, grip strength, and pain. He further asserts that two of the ALJ's findings–that there are no physical findings in Dr. Garman's notes to support the limitations described in his opinion and that Dr. Garman's opinion consisted of a series of check boxes without explanation on a prepared form–are patently false.

Voegele takes exception to the ALJ's characterization of Dr. Garman's treatment as conservative, asserting that such a characterization is a misrepresentation of the facts and that he chose not to pursue all of the courses of treatment recommended by Dr. Garman--physical therapy, a CT scan, an orthopedic surgery consultation, labs, and medications--on account of their cost and

his lack of insurance. Voegele also takes the ALJ to task for cherry picking perceived inconsistencies between Dr. Garman's opinion and the rest of the medical records in order to discount Dr. Garman's opinion. See Gaines v. Colvin, No. 8:15CV207, 2016 WL 617420, at *2 (D. Neb. Feb. 16, 2016) ("ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

Having reviewed the record, the court finds little support for the Voegele's assertion that the ALJ "cherry-picked" the record and improperly discarded or discounted Dr. Garman's opinion. The ALJ considered supportability and consistency factors in considering Dr. Garman's opinion. In so doing he contrasted Dr. Garman's opinion with his own notes and other medical evidence and concluded they were inconsistent.

Dr. Garman's opinion consisted of checked boxes, circled answers, and brief fill in the blank responses. It contains no citation to or discussion of medication evidence and provides little to no elaboration. The ALJ noted as much. See Thomas v. Berryhill, 881 F.3d 672, 675 (8th Cir. 2018) (finding little evidentiary value in a check the box assessment devoid of elaboration and explanation for the conclusions reached). The court appreciates that as a matter of expediency and to ensure that treating physicians "cover all the bases" when rendering their opinion, many rely on check box forms similar to the one utilized by Dr. Garman. However, it does not escape the court's notice that the notes taken by Dr. Garman on the date he completed the form do not entirely align with the opinion expressed in the form.

Turning to Dr. Garman's notes in general, they reflect that on examination, Voegele's physical findings were generally unremarkable. Dr. Garman did suggest a CT scan, labs, (unspecified) medication in March 2018, a surgical consult in April 2018 to address a possible torn

meniscus in Voegele's left knee, and physical therapy after Voegele presented with a knee injury in January 2019. Setting aside Voegele's reason for declining these courses of treatment, it appears that Voegele was able to address them in whole or in part through alternative means as there is little if any mention/discussion of his knees, back and chest in his application for DIB and that these maladies did not otherwise appear central to his claim for DIB.

Like Dr. Garman's notes, the physical findings documented by the consulting physicians were largely unremarkable. Yes, Voegele exhibited some observable deficits on account of his various injuries and what x-rays revealed to be mild arthritic changes. The consulting physicians noted that Voegele had some discomfort to the point that he needed to often shift positions. However, they also noted that Voegele had normal reflexes, a normal gait, the ability to ambulate and to navigate his way through an exam room without issue, and the ability to manipulate objects with both hands, albeit more easily with his right than left. These observations are inconsistent with statements made by Dr. Garman that Voegele could occasionally ambulate, could never uses his hands for fine manipulation, could occasionally use his hands for gross manipulation, and was suffering from pain so severe that it would likely take him off task for almost one-third of a typical workday.

In sum, the record does not support Voegele's contention that the ALJ "cherry-picked" the record or otherwise failed to appropriately apply the new regulations when reviewing medical opinions. Rather, it is apparent from the record that the ALJ properly considered all of the medical evidence and in so doing, concluded that Dr. Garman's opinion lacked supportability and consistency as compared to his notes and the opinions expressed by others.

### B.    ALJ's Step Five Determination

Voegele next asserts that the ALJ's determination at step five is unsupported. Specifically,

he avers that the ALJ's hypothetical to the VE and by extension his RFC determination failed to incorporate the limitations to which Dr. Garman had opined and which would preclude him from performing the work of a kitchen helper and/or sweeper/cleaner.    He further avers the ALJ failed to explain why the portion of Dr. Jackson's opinion that would otherwise be disabling (occasionally reach, finger, handle and feel with his left hand) was not incorporated or accounted for in the RFC determination.  Finally, he avers that the ALJ  cherry picked what was favorable in support of his RFC and disregarded the rest without adequate explanation.

As discussed above, the ALJ evaluated Dr. Garman's opinion in accordance with agency regulations.  He included in his RFC determination all of the limitations that the record as a whole supported.  See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003); Buckner v. Astrue, 646 F.3d 549, 561 (8th Cir. 2011).

### C.    ALJ'S RFC Determination

The ALJs bears "the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000). That said, a claimant's RFC is a medical question and "at least some" medical evidence must support the ALJ's RFC determination.  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Accordingly, "the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id. (internal quotation omitted).

Voegele asserts the following with respect to the ALJ's consideration of his mental limitations when making his RFC determination.  First, the ALJ erred by not addressing Voegele's mild limitations in the  four broad areas of mental functioning in the RFC determination or including them in the hypothetical to the VE.

Under the Rules, the ALJ is required to consider all limitations imposed by the

> claimant's impairments, even those that are not severe.  Social Security Ruling ("SSR") 96-8p (1996).  Even though a non-severe "impairment standing alone may not significantly limit an individuals ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim."

Doc. No. 20 at p. 19.  Second, remand for clarification is appropriate given the ALJ's finding that two conflicting state agency consultant opinions were persuasive.

> [T]he state agency consultant ("SAMC") found that Plaintiff had a *severe* neurocognitive disorder[ ] as a secondary impairment.  T 57.  However, on reconsideration, the SAMC found that Plaintiff's neurocognitive disorder[ ] was *non-severe*.  T73.  Interestingly enough, the ALJ found both of these opinions to be "persuasive." (T17) without recognizing the very different findings.  Moreover, the ALJ did not discuss this diagnosis or any resulting limitations, and Plaintiff was left to speculate why this is so.  This case must be remanded for clarification of this issue; did Plaintiff have severe neurocognitive disorders or not.

Id. at p. 22 (emphasis in original).

With respect to the latter, the court makes two observations.  First, there  little ambiguity in the record regarding the severity of Voegele's neurocognitive disorder in the eyes of the ALJ; at step 3 of his analysis, the ALJ discussed the paragraph B criteria at some length and then concluded that  the Voegele's neurocognitive and adjustment were non-severe.  Second, in his supporting brief Voegele characterizes his mental limitations as mild.  Id. at p. 23 ("The ALJ failed to state what effect those *mild mental limitations* had on Plaintiff's ability to work . . . .") (emphasis added).  Thus,  the assertion that the ALJ's findings are ambiguous and that there is lack of clarity regarding the severity of his neurocognitive disorder is specious.

Turning to the former, an ALJ is not required to discuss a diagnosis or a condition when there is no evidence that imposed any limitations on the claimant's functional capacity.  See Box v. Shalala, 52 F.3d 168, 171 (8th Cir. 1995).  Notably, Voegele has not cited any credible evidence that would demonstrate additional limitations are attributed to his mental impairments.  Conversely,

the ALJ notes that Plaintiff worked for many years after his 1986 motorcycle accident, often above substantial gainful activity levels.  Doc. No. 18-2 at  p. 13, Doc. No. 18-6 at pp. 2-38, 51-57.  The Eighth Circuit has held that if the record suggests a non-severe impairment does not cause limitations, the ALJ need not account for the impairment in the RFC determination.  See Hilkemeyer v. Barnhardt, 380 F.3d 441, 447 (8th Cir. 2024).

> **D.      ALJ's Evaluation of Plaintiff's Subjective Complaints**

Based upon his review the evidence, the ALJ found that Voegele's medically determinable impairments could be expected to cause the alleged symptoms but that Voegele's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in the decision."  Doc. No. 18-2 at pp. 16.

Voegele asserts that his subject complaints were not given a full and fair evaluation by the ALJ and that the ALJ improperly dismissed his complaints with the boilerplate recitation that the "the intensity, persistence, and limiting effects of his symptoms" were "inconsistent with the treatment record and reasons described below."  Doc. No. 20-1 at p. 23.  He further asserts that his ability to engage in activities of daily living, such as a cooking, cleaning, or participating in a hobby, does not constitute evidence of the functional capacity to engage in substantial gainful activity.  Carlson v. Saul, 473 F. Supp. 3d 950, 968 (D. Neb. 2020)

In analyzing a claimant's subjective complaints, an ALJ must consider: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions.  Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (citing Finch v. Astrue, 547 F.3d 933, 935 (8th Cir.2008); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984).  Other factors for

consideration include the claimant's "relevant work history and the absence of objective medical evidence to support the complaints." Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir.2001). These factors are derived from the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984). While ALJs must acknowledge and consider these factors before discounting a claimant's subjective complaints, they "need not explicitly discuss each Polaski factor." Goff, 421 F.3d at 791. ALJs may discount claimants' complaints if there are inconsistencies in the record as a whole. The court will generally defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so. Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007); see also Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.").

Here, the ALJ properly considered the Polaski factors and articulated bases for discounting Voegele's credibility. For example, the ALJ reviewed the objective medical evidence. In so doing, the ALJ noted that, while Voegele had mild arthritic changes in both of his hips and osteoarthritis in his hands, Voegele had relied on aspirin and ibruprofen as needed for pain relief and that there was very little treatment for his impairments reflected in the medical evidence of record. Doc. No. 18-2 at p. 17. The ALJ further noted that, while Voegele had issues with his right thumb, was unable to to fully grip, had generalized stiffness in his hips, and walked with antalgic gait, he remained capable, by Dr. Klindworth's account, of picking up a pen with his right hand without difficulty and with his left hand with some additional effort. Id. Additionally, Voegele showed no hip abnormalities and had normal range of motion on examination. Id.

Turning to Dr. Jackson report, the ALJ noted that, on examination, Voegele had exhibited minimal difficulty with abducting and elevating his arm past his shoulder, mild decreased range of motion in his right wrist, normal grip strength in his right hand and mild decreased grip strength in

28

his right.  Id.  Additionally, Voegele's shoulder ROM was normal, he could abduct and elevate his arms one-hundred eighty degrees bilaterally, his sensation to light touch in his upper and lower extremities was intact, his gate with normal, and he had no difficulties navigating the examination room.  Id.

Moving on to Voegele's activities of daily living, the ALJ noted that Voegele lived in a rural area with his girlfriend, assisted with chores, watched his brother's cattle, fixed barbed wire fencing, tended to his personal needs, drove short distances, and walked for exercise.  Id.  As Voegele has pointed out, such activities are not determinative.  They nevertheless remain a factor for the ALJ to consider when assessing Voegele's credibility.  And Eighth Circuit case law generally suggests that an ALJ may appropriately consider daily activities in conjunction with other factors that may bear upon the issue of credibilty.  See Halvorson v. Astrue, 500 F.3d 922, 932-33 (8th Cir. 2010); Clevinger v. Astrue, 567 F.3d 971, 975 (8th Cir. 2009).

The ALJ's articulated bases for discounting Voegele's subjective complaints were valid. See Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir.2008). Finding substantial evidentiary support in the record for his findings, the court defers to the ALJ's adverse credibility determination.

## IV.    CONCLUSION

In this case, the ALJ correctly applied governing law, regulations, and policy guidance, and there is substantial evidence supporting the Commissioner's decision.  As long as there is substantial evidence supporting the decision, this court may not reverse it simply because there is substantial evidence supporting a contrary outcome or because the court would have decided the case differently.  Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001); see also Schmitt v. Kijakazi, 27 F.4th 1353, 1361 (8th Cir. 2022).

Accordingly, the Commissioner's Motion for Summary Judgment (Doc. No. 21) is

**GRANTED**, Voegele's Motion for Summary Judgment (Doc. No. 20) is **DENIED,**

and the Commissioner's decision is **AFFIRMED.**

     **IT IS SO ORDERED.**

     Dated this 3rd day of December, 2024.

                               */s/ Clare R. Hochhalter*
                               Clare R. Hochhalter, Magistrate Judge
                               United States District Court